*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

CODY ALLAN SPENCER,

       Defendant-Appellant.

UNPUBLISHED
December 21, 2023

No. 364606
St. Clair Circuit Court
LC No. 22-000295-FH

Before: RIORDAN, P.J., and CAVANAGH and GARRETT, JJ.

PER CURIAM.

Defendant appeals by leave granted[1] his sentences for his guilty-plea convictions of domestic violence, third offense, MCL 750.81(5); and attempted assault by strangulation, MCL 750.84(1)(b), MCL 750.92. Defendant was sentenced as a fourth-offense habitual offender, MCL 769.12, to 5 to 20 years' imprisonment for each of his convictions. On appeal, defendant argues there was insufficient evidence to assess 10 points each for offense variables (OVs) 9 and 10, and that he was not given a meaningful opportunity to allocute at sentencing. We affirm defendant's sentences for the reasons explained in this opinion.

## I. BACKGROUND

This case arises out of a years-long domestic relationship between defendant and the victim, KD, culminating in a domestic-violence incident, which led to defendant's arrest at KD's home. During their relationship, defendant and KD lived together at her home with their young child in common, CS. KD and defendant were putting CS to sleep in his own room one evening when defendant brought CS back into the bedroom he shared with KD. A verbal argument began, but escalated to a physical altercation with CS present in the bedroom when defendant pushed KD into the closet. When KD tried to carry CS out of the bedroom, defendant grabbed CS and would not let him leave. Defendant pushed KD into the closet again and she fell to the floor. KD left the

---

[1] *People v Spencer*, unpublished order of the Court of Appeals, entered March 1, 2023 (Docket No. 364606).

bedroom and when she returned, defendant pushed her to the floor again so that his arm lay across her throat, choking her. KD remarked that the abuse from this day left bruises on her arms and back, left abrasions on the side of her face and forehead, and defendant abused her while CS was present in the bedroom.

Defendant's abuse became more volatile over the next few days. In her victim-impact statement, KD wrote: "Over two days he spit in my face repeatedly, ripped my glasses from my face and broke them in half, threw water and pop on me and tried to choke me face down in the couch cushions while verbally threatening me." Defendant was arrested and charged with two counts of attempted assault by strangulation and two counts of domestic violence, third offense. At his plea hearing, defendant pleaded guilty to one count each of domestic violence, third offense, and attempted assault by strangulation. Before sentencing, defendant filed a sentencing memorandum challenging the assessment of OVs 9 and 10 in the sentencing information report (SIR) at 10 points each, arguing that they should both be assessed at zero points.

Defendant advanced these arguments again at sentencing, where KD's impact statement contained in the PSIR was closely scrutinized. She wrote: "We have a child together and I fear I will never be free of him or safe in my own home if he is released back on the street." Most pertinent to this appeal, she wrote:

I will no longer have to hide my debit card in my clothes when I go to bed or sleep with my car keys under my pillow so he doesn't take my car and overdraw my bank account while I'm sleeping. I will no longer let him use our son as a way to get back in my life or in my home.

Finally, KD wrote: "He hasn't even been sentenced yet and I already worry about when he gets released. I know because we share a son he will never leave me alone . . . ."

The trial court opined that because the physical violence, which lead to the charges, started as an argument over where CS should sleep and turned physical while he was still in the bedroom, an assessment of 10 points for OV 9 was appropriate and denied defendant's challenge to that variable. The trial court also relied on KD's statement about defendant using CS as a way to guilt her into letting defendant back into her life and home as evidence of manipulation of a domestic relationship to deny defendant's challenge to the assessment of 10 points for OV 10.

After defendant's challenges, the trial court gave him an opportunity to address the court before it imposed the sentences. Defendant began with an apology to KD, his family, and all involved. The trial court then asked the reason for his behavior, although interrupting him four times, and defendant acknowledged his behavioral issues. Defendant began lamenting his own losses if he went to prison. The trial court disagreed with defendant's contentions and lectured him, then proceeded to sentence him as noted. Defendant now appeals.

## II. ANALYSIS

### A. SENTENCING GUIDELINES

Defendant argues that he is entitled to resentencing because there is no evidence CS was in danger, so CS could not be considered a victim alongside KD to warrant an assessment of 10

points for OV 9. Defendant also argues that there is no evidence to support a finding that KD was vulnerable or manipulated by defendant to warrant an assessment of 10 points for OV 10.

This case concerns the proper application of MCL 777.39 and MCL 777.40. The trial court's factual determinations in applying these guidelines are reviewed for clear error and must be supported by a preponderance of the evidence. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Id*. "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made." *People v Anderson*, 341 Mich App 272, 277; 989 NW2d 832 (2022) (quotation marks and citation omitted).

Defendant argues that OV 9 should have been assessed zero points instead of 10 points. Under MCL 777.39, which governs the assessment of OV 9, 10 points are to be assessed when "2 to 9 victims . . . were placed in danger of physical injury or death[.]" MCL 777.39(1)(c). MCL 777.39(2)(a) instructs the trial court to "[c]ount each person who was placed in danger of physical injury or loss of life or property as a victim." When assessing OV 9, only people placed in danger of injury or loss of life or property during conduct "relating to the sentencing offense" should be considered. *People v Sargent*, 481 Mich 346, 350; 750 NW2d 161 (2008). "A person may be a victim under OV 9 even if he or she did not suffer actual harm; a close proximity to a physically threatening situation may suffice to count the person as a victim." *People v Gratsch*, 299 Mich App 604, 624; 831 NW2d 462 (2013), vacated in part on other grounds 495 Mich 876 (2013), citing *People v Morson*, 471 Mich 248, 262; 685 NW2d 203 (2004) (holding that the trial court properly assessed 10 points for OV 9 when someone was "standing nearby" as an armed robbery of someone else occurred but was not physically harmed).

Defendant argues that assessment of OV 9 "must be based on the facts and not on what might have happened." However, the language of MCL 777.39 directs the trial court to consider how many people were placed in danger of physical injury or death by using the facts presented to determine what could have reasonably happened based on each person's proximity to the events leading to the conviction. In other words, the trial court is required to analyze those "placed in danger," which necessarily means that there is no requirement the person actually suffered harm. MCL 777.39(2)(a). Further, trial courts are permitted to make reasonable inferences arising from the record evidence to sustain the assessment of an offense variable. *People v Carlson*, 332 Mich App 663, 668; 958 NW2d 278 (2020).

The trial court inferred that, because the physical altercation started as a verbal argument over where CS should sleep and turned physical while he was still in the bedroom, CS was in close proximity to a threatening situation. The statements in the PSIR indicate that after defendant pushed KD into the closet, she regained balance and tried to carry CS out of the bedroom, but defendant grabbed CS and would not let him leave with KD. Defendant pushed KD into the closet again and she fell to the floor. Contrary to defendant's argument that there is no evidence CS could have been struck, it is possible KD was holding CS when she was pushed into the closet the first time, or defendant was holding CS when he pushed KD into the closet the second time. But even if CS was not physically caught between the two, the trial court found that "this was a very very violent attack that started with an argument over this child, concerning this child, with the

child present. The child, according to [KD], observed her being assaulted . . . ." On these facts, it was reasonable for the trial court to infer that CS was a second victim alongside KD within the meaning of MCL 777.39(2)(a) because of his close proximity to the assault, even if he did not suffer actual harm. The trial court's factual determinations are supported by the record, and not clearly erroneous. *Anderson*, 341 Mich App at 277. Further, a preponderance of the evidence supported the trial court's assessment of 10 points for OV 9, and the trial court did not err in scoring that variable. *Hardy*, 494 Mich at 438.

Defendant also argues that the assessment of 10 points for OV 10 was erroneous. OV 10 concerns the exploitation of a vulnerable victim. MCL 777.40(1). Relevant to this appeal, MCL 777.40(1)(b) directs the trial court to assign 10 points where "[t]he offender exploited . . . a domestic relationship" during the conduct related to the sentencing offense. " 'Vulnerability' means the readily apparent susceptibility of a victim to injury, physical restraint, persuasion, or temptation." MCL 777.40(3)(c). To " '[e]xploit' means to manipulate a victim for selfish or unethical purposes." MCL 777.40(3)(b). "[T]o qualify as a 'domestic relationship,' there must be a familial or cohabitating relationship." *People v Jamison*, 292 Mich App 440, 447; 807 NW2d 427 (2011). However, MCL 777.40(2) warns that the "mere existence" of a domestic relationship "does not automatically equate with victim vulnerability." Our Supreme Court has explained that "points should be assessed under OV 10 only when it is readily apparent that a victim was 'vulnerable,' i.e., was susceptible to injury, physical restraint, persuasion, or temptation." *People v Cannon*, 481 Mich 152, 158; 749 NW2d 257 (2008).

To uphold the trial court's assessment of OV 10 at 10 points, we must determine whether the trial court's decision was supported by a preponderance of the evidence. More specifically, we must consider whether it was clear error for the trial court to infer: (1) defendant and KD were in a familial or cohabitating relationship; (2) defendant manipulated KD for selfish or unethical purposes; and (3) KD was susceptible to injury, physical restraint, persuasion, or temptation. MCL 777.40. On appeal, defendant does not challenge whether a domestic relationship existed between the parties, as it is clear the two shared a child in common and lived together at KD's home where they coparented their child, CS, evidencing a familial and cohabitating relationship.

Defendant instead challenges the trial court's reliance on KD's impact statement contained in the PSIR to infer that KD was exploited and vulnerable. Regarding exploitation, KD expressed that she will no longer allow defendant to use their son, CS, as a way to get back into her home and life. At sentencing, the trial court stated that manipulation does not require showing defendant specifically did something, but instead reasoned that manipulation is the breaking down of someone's will. The trial court inferred that KD's statements proved defendant used CS as a way to break down KD's will and guilt her into doing things she did want to do. Defendant benefited from continuing his domestic relationship with KD because, according to her statement, she paid all the bills while defendant would overdraw her bank account when she was sleeping, and punch holes in the wall or destroy her personal items during fits of anger. She wrote: "He come's [sic] back each time this happens and stakes claim to the home I pay for and eventually all the promises and 'good behavior' leave and once again we are in a living nightmare." It was reasonable for the trial court to infer that defendant exploited KD within the meaning of MCL 777.40(3)(b) because he manipulated his relationship with CS to remain in KD's life to continue to abuse her and benefit from her financially while contributing nothing.

Finally, although the trial court did not expound on these conclusions at sentencing, we note that KD was vulnerable because she was susceptible to both injury and persuasion. The record establishes that there were two previous incidents of domestic violence between defendant and KD during their five-year relationship. As mentioned, defendant also broke KD's personal items in her presence and punched holes in the walls of her home. Despite this, KD continued to live with defendant in reliance on his false promises to change, evidencing that she was likely to be injured again both physically and mentally.

The facts that prove exploitation also lend to KD's susceptibility to persuasion. Because the parties have a child in common, KD wrote: "I know because we share a son he will never leave me alone . . . ." Defendant used CS as leverage to continue abusing KD, whose expressed fear drove her to continue tolerating defendant's violent behavior. Defendant threatened her and promised to cause chaos if she tried to remove him from her life. Because the facts establish KD's actions were driven by fear, it was reasonable for the trial court to infer that KD was vulnerable because she was susceptible to both injury and persuasion. MCL 777.40(3)(c). The trial court's findings that KD was vulnerable and defendant exploited her were supported by the record, and not clearly erroneous. *Anderson*, 341 Mich App at 277. Further, on the basis of these facts, the trial court's assessment of 10 points for OV 10 was supported by a preponderance of the evidence. *Hardy*, 494 Mich at 438.

Because the trial court did not err in assessing OVs 9 and 10 at 10 points each and defendant's sentencing guidelines range remains unchanged, defendant is not entitled to resentencing. We affirm defendant's sentences with respect to assessment of OVs 9 and 10.

## B. RIGHT OF ALLOCUTION

Defendant lastly argues that the trial court did not give him a meaningful opportunity to allocute at sentencing because he believes the judge interrupted him and improperly "peppered" him with questions and attacked his statements almost immediately after he began to speak. Where the defense fails to place an objection regarding the defendant's right to allocute on the record at sentencing, he fails to preserve the issue. *People v Bailey*, 330 Mich App 41, 66; 944 NW2d 370 (2019). Such was the case here, rendering this issue unpreserved for appellate review.

Generally, a challenge regarding the right to allocute involves the interpretation of court rules, which, like statutes, is a question of law that we review de novo. *People v Petit*, 466 Mich 624, 626-627; 648 NW2d 193 (2002). Further, "[w]hen a defendant argues that a trial court denied them the right of allocution at sentencing in violation of MCR 6.425, this Court also reviews de novo the scope and applicability of the common-law right to allocute, also a question of law." *People v Dixon-Bey*, 340 Mich App 292, 296; 985 NW2d 904 (2022) (quotation marks and citation omitted).

However, where a defendant fails to preserve an issue for appellate review, we review for plain error affecting substantial rights. *Bailey*, 330 Mich App at 66. "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. Finally,

"[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. at 763-764 (cleaned up).

Defendant contends that he is entitled to be resentenced because the trial court violated his right to allocute by repeatedly interrupting him. Under MCR 6.425(D)(1)(c), the trial court must, on the record at sentencing, "give the defendant, the defendant's lawyer, the prosecutor, and the victim an opportunity to advise the court of any circumstances they believe the court should consider in imposing sentence . . . ." This is known as the right of allocution, with which trial courts must "strictly comply." *People v Kammeraad*, 307 Mich App 98, 149; 858 NW2d 490 (2014).

This Court has found that a defendant is deprived of "a meaningful opportunity for allocution" where the trial judge interrupts and imposes sentence as soon as the defendant begins speaking, or interrupts the defendant on multiple occasions as he or she continues to speak. See *Bailey*, 330 Mich App at 67-68. "[A] single interruption, where a defendant otherwise receives a reasonable opportunity to speak, does not deprive the defendant of the right of allocution." *Dixon-Bey*, 340 Mich App at 302. An interruption also is appropriate where the trial court seeks clarification of a defendant's statements. *Id*. However, if it appears from the exchange that the trial court's interruptions are frequent enough that the defendant is too intimidated to address the court any further, resulting in an "illusory and superficial opportunity for allocution," the defendant is entitled to resentencing. *Id*. at 303. After allocution and during sentencing, the trial court may deliver a lecture or express disbelief but must first permit the defendant a meaningful opportunity to speak. *Id*. at 302.

At sentencing, the following exchange occurred:

> *The Court*: [Defendant], what would you like to say to me before I impose sentence?
>
> *The Defendant*: Um, I'd first like to apologize.
>
> *The Court*: To whom?
>
> *The Defendant*: To [KD] and to my family and everybody involved. Um, 'cause I am sorry and I do hold myself accountable. My behavior was absolutely unacceptable.
>
> *The Court*: Why'd you do it?
>
> *The Defendant*: We—it became a toxic relationship and I have, clearly have control and behavioral issues.
>
> *The Court*: Okay.
>
> *The Defendant*: That, that I definitely need—

-6-

*The Court*: So now you're telling me you have these issues, you obviously knew you had them at the time.

*The Defendant*: I should have got help. I should have left her.

*The Court*: And why didn't you? Why didn't you?

*The Defendant*: I didn't leave because of my son.

*The Court*: I mean, you've assaulted this woman once before.

*The Defendant*: Um, not—

*The Court*: You knew you had anger management issues. You knew you have impulse control issues. Why didn't you get help before this?

*The Defendant*: I thought I could do it my own. I suppose. Um, I, I just wanted make [sic] one thing clear that I've never been violent with my children.

*The Court*: Doesn't matter.

*The Defendant*: And my—okay. Um, and—

*The Court*: You've only been violent with the mother of your child.

*The Defendant*: I, I understand that. She's um, I'm sorry. I, I don't want to leave my son for five years and I'm a good father and he—

*The Court*: No you're not. You beat up his mother.

*The Defendant*: I'm sorry. I've never been more sorry about anything in my life. I'm not losing only my time I'm losing everything that mattered to me—

*The Court*: Okay.

*The Defendant*: —in my life, which was her, my family and everything. It's not just about me. I'm losing all of everything. So I understand that it was wrong. I understand that I caused her pain and my, my family. Believe me I do. This is like a nightmare to me as well. I should—I wish there—I—if, if it was up to me I would try to do everything I can to make my changes right now to not lose my son. There has to be something more than sending me away for five years and I don't get to see him again.

\* \* \*

*The Court*: . . . Okay, sir. Let me tell you, and I've got the floor and I don't want to hear anything else out of you.

*The Defendant*: Okay.

*The Court*:  All I'm hearing is I, I, I.  I'm not going to see my, my son for five years.  I'm not going to have this.  I'm not going to have that.  Only once, only once did I hear you say you were sorry you inflicted pain on your child's mother.  The rest was about you and that's where the problem lies.  You care about yourself.

*The Defendant*:  I understand.

*The Court*:  That's where a big part and perhaps all of the problem lies.  Somewhere along the line you weren't held, you were not held accountable for your behavior in a meaningful way.  My guess is it probably started when you were really young.  And it has escalated to this point and nobody is responsible for your behavior but you.

*The Defendant*:  Yes, ma'am.

*The Court*:  And yet your concern is for yourself.  Your concern is obviously not for the victim of these brutal assaults.  And your concern is not for your child or you wouldn't do this to his mother and you wouldn't do some of it in his presence.

*The Defendant*:  Yes, ma'am.

*The Court*:  Or at least to the point where I'm sure he heard it going on.

*The Defendant*:  Yes, ma'am.

*The Court*:  You, sir, should be ashamed of yourself.

*The Defendant*:  I am.

*The Court*:  Of course you are.  I'm going to accept and follow the recommendation of the Probation Department.  This is the least you should receive for what you've done, sir.

The trial court then proceeded to sentence defendant as noted.

Contrary to defendant's argument that the trial court "peppered" him with questions, the sentencing transcript illustrates that the court's questions only prompted him to continue speaking. Unlike the trial court in *Dixon-Bey*, the trial court's several interruptions here did not intimidate defendant or stop him from addressing the court further. *Dixon-Bey*, 340 Mich App at 300-302. Nor did the trial court interrupt defendant as soon as he began speaking to impose sentence as in *Bailey*, 330 Mich App at 67.  The trial court paused and listened long enough to afford defendant the opportunity to give a short monologue apologizing for the abuse he inflicted and express that he would like the judge to consider something other than a five-year prison sentence so he would not lose his son.  The trial court also did not lecture defendant until he was done speaking and it

was time for sentencing. No clear or obvious error occurred during defendant's allocution at his sentencing.[2]

### III. CONCLUSION

The trial court did not err by assessing 10 points each for OVs 9 and 10. There also was no plain error that affected defendant's right of allocution at sentencing. Affirmed.

/s/ Michael J. Riordan
/s/ Mark J. Cavanagh

---

[2] We note that the sentencing transcript, when indicating that the trial court interrupted defendant, apparently used a hyphen to suggest that defendant was prevented from speaking at that point. Notably, there was no hyphen at the end of the following statement by defendant at the beginning of the above-quoted exchange:

> To [KD] and to my family and everybody involved. Um, 'cause I am sorry and I do hold myself accountable. My behavior was absolutely unacceptable.

The fact that there was no hyphen at this point suggests that this statement was originally intended by defendant to constitute his entire allocation, and that he was not prevented by the trial court from delivering it.